[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this action, the plaintiff wife seeks a dissolution of her marriage to the defendant husband on the grounds of irretrievable breakdown. The parties appeared through counsel and were heard during two days of trial. Each party presented evidence from real estate appraisers. The wife presented testimony from Francis Gordon, an accountant and tax preparer, regarding the tax implications of alimony, and the chief financial officer of the husband's employer testified concerning the husband's employment and financial benefits. Both parties filed financial affidavits and written proposed orders. The court heard the testimony, observed the demeanor of the parties, and evaluated the credibility of the parties and the witnesses.
Based upon the evidence, the court makes the following findings. The court has jurisdiction, and all statutory stays have expired. The wife, under the maiden name of Bednarczok, was intermarried with the husband on December 24, 1970 in Lublin, Poland. At the time of the marriage, the wife was twenty-two and the husband was twenty. Their one child of the marriage, a son, Paul, is now twenty-six. No minor children have been born to the wife since the date of the marriage.
Because of economic and political conditions in their native Poland in the early 1970's, the first two years of the marriage were difficult. The wife worked initially as a dietician and later in international transactions in a bank. The husband worked in a factory. The parties lived with the husband's mother and her husband in a small apartment. They experienced a great deal of tension.
In 1972, the husband decided to leave Poland when his supervisor required him to join the Communist Party as a condition of continued employment. Soon after that decision, but before the husband left the country, the wife moved in with her mother. In order to leave Poland, the husband had to "go on vacation, and never come back." It was impossible for the wife or CT Page 15216 child to obtain an exit visa, and impossible for her over the next five years to leave the country unless she left the child behind as security for her return. As a result, the parties experienced a five-year separation when they were barely two years into their marriage. During that time, the husband sent only $500 as support for his wife and child, having ignored her request for $20 per week. In 1977, the wife and their son joined the husband in Connecticut, where she has remained except for a brief separation in 1978, when she and Paul returned to Poland because of marital difficulties.
The wife, now fifty, began working in the banking industry three years after she first arrived in the United States. She did not immediately enter the work force because she was caring for a young child and because it took her two years to acquire sufficient fluency in English to make her marketable. Although she received a number of promotions, her salary has not grown greatly in recent years. She is presently an assistant branch manager for American Savings Bank, where she earns $33,000 per year and receives up to $44 per week for completing mortgage applications when that work is available. She suffers from ulcers, depression, and migraine headaches, and takes medications for these conditions.
The husband will be forty-eight in December. During his first years in the United States, he worked in relatively menial factory jobs for some years, ultimately rising to an electrician's job at Colt Industries. In 1978, however, he began to work at Reflexite, initially in the technical trades responsible for electrical and other maintenance, and later in increasingly important management jobs. He also educated himself at night, earning a bachelor's degree and a master's degree in business administration. As his responsibilities at Reflexite increased, so did his time away from home. In 1995, he accepted the position of managing director for his employer's Danish division, and became the company's head of European operations prior to his return to the United States in 1998. The wife did not join him during his European assignment. The husband's 1995 gross taxable income was $250,000, his highest ever. His current salary is $80,000 per year, with up to an additional $50,000 for bonus. He will not reach his bonus target because the company is experiencing a downturn in business, but is expected to earn a bonus of $40,000. He has acquired a substantial amount of Reflexite stock during his employment with the company. Including stock options, an E.S.O.P. retirement account, and stock held or CT Page 15217 sold by him, the Reflexite shares account for approximately $650,000 of the assets on his financial affidavit.
The parties own a home in a development of cluster houses located in Farmington. The house was acquired in 1992 and has great sentimental value to both of them. Richard Vincent, the plaintiff's appraiser, valued the house at $325,000, while John Flynt, the defendant's appraiser valued it at $350,000 based upon his analysis that there has been an upward trend in housing prices. Mr. Flynt did not offer any evidence to substantiate his opinion that the market value is increasing, and in fact one of his three comparable sales shows a decrease in value of more than $10,000 between June 1997 and October 1998. The court finds Mr. Vincent more credible with respect to his appraisal, and finds that the value of the marital home is $325,000.
The plaintiff asserts that the defendant is at fault for causing the breakdown of the marriage because of his numerous affairs, the most recent of which involved a young woman he met while working in Europe during the past three years. The court finds that these relationships took place, but finds that they are symptoms of the more significant fault the defendant bears for the breakdown of the marriage. It is clear that he was not committed to the marriage or to his wife for the greater part of the twenty-eight years the marriage lasted. He testified that when he left Poland in 1972, it was because he had no family and was free to do so. He did not provide spousal or child support for the five years he was separated from his wife.[1] After his family came to the United States, he devoted himself to his career and education, and he achieved remarkable and well-deserved success in both. However, he testified that in 1988 he did not feel any sense of loyalty to his wife. That attitude appears to have been chronic throughout the marriage. The wife's self-confidence suffered because of her inability to keep her family together.
In making orders, the court has considered the statutory criteria for the division of property and for the award of alimony and counsel fees as set forth in Connecticut General Statutes Sections 46b-62, 46b-81, and 46b-82, together with relevant case law. The court has reviewed the proposed orders of the parties and their respective financial affidavits.[2] The court has also considered the tax implications of its orders. It is ordered as follows:
1. The court has jurisdiction, and all statutory stays have CT Page 15218 expired. The allegations of the complaint have been proven. The marriage has broken down irretrievably, and the same is hereby dissolved.
2. The husband shall transfer to the wife all of his right, title, and interest in and to real property known as 2 Chipping Campden, Farmington, Connecticut, together with all rights appurtenant thereto. The wife shall be responsible for the payment of the mortgages, common charges, and taxes on said property, and shall hold the husband harmless and indemnify him on account of those.
3. The wife shall keep her automobile and all household furnishings and personal property, and shall be entitled to receive and keep payment of a $7,000 loan made by the parties to her brother. She shall also keep her $1,000 bank account; her $12,477 IRA; her pension, currently valued at $13,500; and her Webster Bank E.S.O.P. currently valued at $14,250.
4. The husband shall transfer the following to the wife;
a. $10,000, within thirty days hereof,
b. The entire escrow account into which bonuses were to be placed, which is valued at $37,469 including the bonus contribution due for payment in December 1998, within thirty days hereof;
c. One half of his Reflexite E.S.O.P., by Qualified Domestic Relations Order to be completed by his attorney within twenty days hereof;
d. One half of his Fidelity Growth Advisor Fund 401k, by Qualified Domestic Relations Order to be completed by his attorney within twenty days hereof;
e. One third of his interest in and rights to the promissory note dated March 20, 1998 from Reflexite Corporation to Roman Kaflinski in the principal amount of $148,770, together with a proportionate share of the interest thereon, by executing an assignment of said one-third of said note and causing the same to be delivered to the wife and to be lodged in the corporate offices of Reflexite Corporation within twenty days hereof, provided that if the assignment is not accepted or honored by Reflexite Corporation for any reason, the husband shall pay the wife the sum of $49,590 plus interest as provided in the note within ten days of his receipt CT Page 15219 of his receipt of payment on the note or any portion thereof, and provided further that if the note is not paid by Reflexite Corporation, the husband shall pay the wife the sum of $49,590 plus interest as provided in the note within ten days of receiving notice or knowledge that the note will not be paid.
5. The husband shall keep, free of claim by the wife except as otherwise provided or implied herein, one half of his Reflexite E.S.O.P.; one half of his Fidelity Growth Advisor Fund 401k; two-thirds of his interest in the Reflexite note; all stocks, restricted stocks, and stock options, vested and unvested, he has in Reflexite; all of his interest in the cash and stocks in Bank Pakeo; his $3080 bank accounts; and his $7434 Fidelity IRA.
6. The husband shall pay the wife the sum of $600.00 per week as alimony, plus twenty (20%) per cent of any bonus he receives) until she has reached the age of sixty-five or has become eligible to receive distributions from the husband's Reflexite E.S.O.P., whichever is later, at which time the parties shall submit the question of the amount of continuing alimony to the court. Alimony shall terminate only on the death of either party or the remarriage of the wife. Alimony shall be modifiable as to amount, but shall not be modifiable as to term.
7. So long as the husband has life insurance available through his employer, he shall name the wife as irrevocable beneficiary on such insurance. In the event that he does not have life insurance available through his employer, he shall name the wife as irrevocable beneficiary on his Reflexite E.S.O.P. to the extent of $160,000. He shall not pledge, liquidate, or otherwise diminish his E.S.O.P. nor create any other irrevocable beneficiary on his Reflexite E.S.O.P. so long as this order remains in effect, but may in his discretion elect to purchase $160,000 in life insurance in lieu of naming his wife as irrevocable beneficiary under his Relexite E.S.O.P. as required herein.
8. The parties shall exchange tax returns annually on or before September 1 of each year.
9. The parties shall be responsible for the debts shown on their respective financial affidavits, and shall hold the other harmless and indemnify the other with respect to said debts.
10. The parties shall pay their own attorney fees. CT Page 15220
Orders shall enter accordingly.
BY THE COURT,
Gruendel, J.